AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Tulalip Resort Casino, Room Number 1111 and Gray 2007 BMW X5, more fully described in Attachment A

)
)
)
)
)

Case No. MJ19-0058-DWC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Tulalip Resort Casino, Room Number 1111 and Gray 2007 BMW X5, more fully described in Attachment A.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Possession with intent to distribute controlled substances; conspiracy to distribute controlled substances; money laundering and conspiracy to launder money; |
| 18 U.S.C. § 1956 | |

The application is based on these facts:
✔ See Affidavit of Anthony L. Paz, DEA TFO, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Anthony L Paz, DEA Task Force Officer
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 2-1-19

_____
*Judge's signature*

City and state:  Tacoma, Washington

DAVID W. CHRISTEL United States Magistrate Judge
*Printed name and title*

USAO: 2018R01373

**AFFIDAVIT OF ANTHONY L. PAZ**

STATE OF WASHINGTON      )
                         )      ss
COUNTY OF WHATCOM        )

I, Anthony L. Paz, being first duly sworn on oath, depose and say:

## I.     INTRODUCTION AND AGENT BACKGROUND

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  Specifically, I am a Task Force Officer with the Drug Enforcement Administration ("DEA"), assigned to the Bellingham, Washington Resident Office.  In that capacity, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, *et seq*.).  I have been assigned as a Task Force Officer with the DEA since January 2015.  Prior to becoming a Task Force Officer, I was a Deputy with Whatcom County Sheriff's Office, Washington.  In my experience as a law enforcement officer, I have participated in numerous narcotics investigations, during the course of which I have participated in physical surveillance, undercover operations, and executions of search warrants.

2.      I have completed the Washington State Criminal Justice Training Center Under Cover Operations School as well as other training courses related to gangs and narcotics trafficking.  I have participated in narcotics investigations at both the local and federal level, and I have participated in numerous federal search warrants.  As a result, I have become familiar with how drug traffickers and organizations operate.  As a Task Force Officer with the DEA, one of my responsibilities is to work with other federal and state law enforcement officers to investigate violations of federal and state controlled substance laws, including the investigation of organizations that distribute cocaine, methamphetamine, heroin, fentanyl, marijuana and other dangerous drugs.

3.      I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 1
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  smuggling, distribution, packaging, trafficking, avoiding law enforcement, and

2  laundering proceeds, among other concerns related to drug trafficking.  I have discussed

3  and learned from other law enforcement investigators in regards to these matters as well.

4          4.       Based on my training, experience and conversations with other experienced

5  narcotics investigators, I have gained experience in the techniques and methods used by

6  drug traffickers to distribute controlled substances, their use of cellular phones and other

7  electronic communication devices to facilitate their trafficking activity, and the methods

8  used to conceal and launder the proceeds of said activity.

9          5.       The facts in this affidavit come from my personal observations, my training

10  and experience, and information obtained from other agents and witnesses.  My

11  specialized training and experience in drug investigations form a basis for my opinions

12  and conclusions, which I drew from the facts set forth herein.

13              II.       PURPOSE OF THIS AFFIDAVIT

14          6.       I make this affidavit in support of an application for warrants authorizing

15  the search of the following property and vehicle, which are further described below and

16  in Attachment A (attached hereto and incorporated by reference as if fully set forth

17  herein), for evidence, fruits and instrumentalities, as further described in Attachments B

18  (attached hereto and incorporated by reference as if fully set forth herein), of the crimes

19  of *Distribution of, and Possession with Intent to Distribute, Controlled Substances*, in

20  violation of 21 U.S.C. § 841(a)(1); *Conspiracy to Distribute, and to Possess with the*

21  *Intent to Distribute, Controlled Substances*, in violation of 21 U.S.C. §§ 841(a)(1) and

22  846, *Use of Communications Facilities to Commit, Facilitate, or Further an Act or Acts*

23  *which Constitute a Felony*, in violation of 21 U.S.C. § 843(b); and/or *Money Laundering*

24  *and Conspiracy to Launder Money*, in violation of 18 U.S.C. §§ 1956 and 1956(h), as

25  described herein:

26          a.  **Target Location 5 (TL5) :**  10200 Quil Ceda Blvd, Tulalip,

27              Washington 98271, Room 1111 is a hotel room located inside of the

28

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 2
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Tulalip Resort Casino Hotel.  The hotel room is marked with the hotel

2    room number 1111.  **TL5** is believed to be the hotel room occupied by

3    Jennifer JENSEN and Charles CROTEAU.

4    b. **Target Vehicle 2 (TV2): is a Gray, 2007 BMW X5 displaying**

5    Washington License plate BNH2302.  **TV2** is registered to Charles

6    CROTEAU at 4710 Alderson Road, Apartment 21, Blaine, Washington.

7    7.    For **TL5**, authority to search extends to all parts of the hotel room,

8  including any garage spaces, storage areas, curtilage, containers, compartments, or safes

9  located in TL5 or associated with the specific hotel room of TL5, whether locked or not,

10 where the items described in Attachment B could be found.  For each **TV2**, authority to

11 search similarly extends to all parts of the vehicle and any cases, containers,

12 compartments, or safes located in the vehicle, whether locked or not, where the items

13 described in Attachment B could be found.

14              **III.    SOURCES OF INFORMATION**

15    8.    I make this Affidavit based upon personal knowledge derived from my

16 participation in this investigation and upon information I believe to be reliable from the

17 following sources:

18    a.  My training and experience investigating drug trafficking and related
19        criminal activity, as described above;

20    b.  Oral and written reports and documents about this and other investigations
         that I have received from agents of the DEA and the Whatcom County
21       Sheriff's Office (WCSO), Washington State Patrol (WSP) and other federal,
         state and local law enforcement agencies;
22

23    c.  Physical surveillance conducted by the aforementioned agencies, and other
         law enforcement agencies, that has been reported to me directly or indirectly;

24    d.  Telephone toll records, pen register and trap and trace information, and
25       subscriber information;

26    e.  Washington State Department of Licensing records;

27    f.  Commercial Databases;

28    g.  Public records; and

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

        h.  Publicly viewable information on social media websites (*i.e.*, Facebook).

        i.  Confidential sources/informants;

        j.  Pole cameras;

9.    Since this Affidavit is being submitted for the limited purpose of seeking authorization for the above requested search warrants, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for a fair determination of probable cause to support the Application.

10.    In the following paragraphs, I describe communications between various individuals. Except where specifically indicated with quotation marks, the descriptions are summaries of the conversations and are not meant to reflect the specific words or language used.

## IV.   THE INVESTIGATION

### A.  Arrest of Jennifer JENSEN on July 31, 2018

11.    On July 31, 2018, a Whatcom County Sheriff's deputy conducted a routine patrol and saw Jennifer JENSEN with two other individuals in a Whatcom County park known to deputies as a place where people often deal drugs. The deputy identified JENSEN and saw her put a small stroller into the back of a pick-up truck. The deputy contacted JENSEN and took her into custody based on her outstanding warrants. The other two individuals with JENSEN did not want to take custody of JENSEN's stroller and left it with the deputy. A narcotics detecting K-9 was deployed on the stroller and gave a positive alert to the presence of the odor of narcotics emanating from the stroller. Officers obtained a search warrant from Whatcom County District Court Commissioner Tony Parise for the stroller and searched it. They found approximately $1,260 in US Currency, a lighter with heroin residue on it, and approximately 20 pills, which based on the markings appeared to be oxycodone. The residue on the lighter field tested positive

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 4
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  for the presumptive presence of heroin.  The pills were submitted to the Washington State

2  Patrol laboratory and were determined to contain Fentanyl.

3        12.     According to NCIC, JENSEN has a 1995 felony conviction for

4  manufacture, deliver, or possession with intent to manufacture or deliver, a controlled

5  substance.  JENSEN also has a 2016 misdemeanor conviction for possession of a

6  controlled substance without a prescription.  In addition to the controlled substance

7  violations, JENSEN has convictions in 2016 and 2005 for theft.

8  **B.**     **Controlled Purchase of Methamphetamine and Percocet Pills from JENSEN**

9            **on August 29, 2018**

10        13.     In late August 2018, investigators from Skagit County obtained information

11  from a confidential source (CS1) that he/she could buy methamphetamine from Jennifer

12  JENSEN.

13        14.     CS1 started working for Skagit County investigators in August 2018 in

14  hopes that CS1 would not be charged in connection with a driving while suspended

15  charge and possession of controlled substance.  CS1 conducted approximately five

16  controlled purchases for Skagit County.  While signed up as a CS, CS1 was questioned

17  by non-law enforcement personnel about being a CS; CS1 subsequently admitted to being

18  a CS to non-law enforcement.  After being identified as a CS, CS1 could no longer work

19  as a CS and was deactivated in January 2019 for disclosing sensitive law enforcement

20  tactics, equipment, and surveillance methods to the non-law enforcement personnel.

21  According to NCIC, in 2014, CS1 had felony convictions for residential burglary, theft,

22  trafficking in stolen property, and identify theft. Also in 2014, CS1 had misdemeanor

23  convictions for driving while license suspended or revoked, domestic violence, violating

24  a domestic violence protection order, and domestic violence disorderly conduct.  In 2013,

25  CS1 had misdemeanor convictions for driving with license suspended or revoked and

26  criminal trespass.   In 2010, CS1 had misdemeanor convictions for malicious mischief

27  and negligent driving.  In 2009, CS1 had a misdemeanor theft conviction.  In 2008, CS1

28  had felony convictions for possession of controlled substances and forgery.  Also in

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 5
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  2008, CS1 had misdemeanor convictions for theft, driving with license suspended or

2  revoked, and driving without a license.  CS1 has a 2007 felony conviction for possession

3  of a controlled substance.  Also in 2007, CS1 had misdemeanor convictions for theft,

4  driving with license suspended or revoked, and drug paraphernalia.  In 2005, CS1 had

5  misdemeanor theft conviction, and in 2004, CS1 had a misdemeanor conviction for

6  domestic violence.

7        15.      On August 29, 2018, CS1 told investigators that CS1 contacted JENSEN

8  over the phone, prior to meeting investigators, and arranged to meet JENSEN for the

9  purpose of buying controlled substances.  Before the meeting with JENSEN, officers

10  searched CS1 for contraband, to include, drugs, weapons, and large amounts of currency,

11  with negative results.  Investigators provided CS1 with pre-recorded buy funds.[1]

12  Investigators dropped CS1 off near the agreed upon meeting location.  Investigators saw

13  CS1 walk to the agreed upon meeting location and walk up to a green Chevrolet

14  Suburban, which agents later saw had Washington license plate BDY0152.  Investigators

15  saw CS1, JENSEN, and an individual later identified as Charles CROTEAU walk into a

16  local area business, where all three individuals were briefly out of view.  A short time

17  later, investigators observed all three individuals walk out of the business.  After the three

18  individuals separated, investigators picked up CS1 and searched CS1 for contraband, to

19  include additional drugs, money, and weapons, with negative results.  Investigators

20  obtained the 2.8 grams of methamphetamine and 10 Percocet pills from CS1.  During a

21  subsequent debriefing, CS1 told investigators that CS1 exchanged the pre-recorded buy

22  funds with JENSEN in exchange for the controlled substances.

23        16.      According to NCIC, CROTEAU has a 2006 felony conviction for

24  possession of a controlled substance, 2008 felony convictions for theft and identify theft,

25  a 2007 felony conviction for unlawful possession of a firearm.  Additionally, CROTEAU

26

27  ───────────────

28  [1] CS1 was not equipped with a recording device to preserve possible Washington State prosecution.

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 6
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  has misdemeanor convictions in 2008 for assault and 2007 for possession of stolen

2  property and making false/misleading statements to a public servant.

3  **C.     Arrest of JENSEN on October 19, 2018**

4          17.     On October 19, 2018, Whatcom County Sheriff's Deputies arrested

5  Jennifer JENSEN for active felony warrants out of Whatcom County Superior Court for

6  failure to appear on Possession of a Controlled Substance with Intent to Deliver (two

7  counts) at the Holiday Inn, located at 4260 Mitchell Way, Bellingham, Washington.  The

8  charges stem from the Whatcom County deputy's encounter with JENSEN on July 31,

9  2018, described above.  Hotel staff allowed deputies to view, and later provided a copy to

10 deputies, of hotel records that indicated that JENSEN rented room 207 on October 18,

11 2018, for one night and that she had provided the hotel with the phone number 360-224-

12 6279 (TT2) and listed a BMW X6M, with Washington license plate BLL3804, as her

13 vehicle.  According to the Washington Department of Licensing, the license plate

14 BLL3804 is associated with a 2011 BMW X6 registered to Charles CROTEAU at 4710

15 Alderson Road Apartment 31, Blaine, Washington (TL1).

16         18.     According to T-Mobile records, TT2 is subscribed to "Jennifer J JENSEN"

17 at 1824 Lakeside Avenue, Bellingham, Washington 98229.

18 **D.     Controlled Purchase of Methamphetamine from SIRMANS on January 10,**
19 **       2019**

20         19.     On January 10, 2019, a Whatcom County Drug Task Force confidential

21 source (CS3) conducted a controlled purchase of methamphetamine from Kode

22 SIRMANS.  CS3 told investigators that SIRMANS used phone number 360-812-1586.

23 According to AT&T, this phone was resold to TracFone with no additional subscriber

24 information provided.

25         20.     CS3 also told investigators that SIRMANS had previously told CS3 that

26 SIRMANS got his drugs from "Jen" who lives in Birch Bay.  According to Washington

27 Department of Licensing, JENSEN and CROTEAU's driver's licenses list their address

28 as TL1, which is the same address at which CROTEAU's BMW X6 is registered.  Birch

1   Bay is located in Northwest Whatcom County and is an area associated with Blaine,

2   Washington addresses. The Alderson address is in the Birch Bay area.

3       21.     CS3 is an active CS working in the hopes that law enforcement will not

4   charge CS3 in connection with the possession of a controlled substance. CS3 was

5   activated in December 2018, and has not conducted any other controlled purchases apart

6   from those involving SIRMANS. CS3 has had no performance issues to date. A NCIC

7   check indicated that CS3 has no identifiable criminal history.

8       22.     On January 9, 2019, investigators directed CS3 to contact SIRMANS to

9   arrange for the purchase of heroin from SIRMANS. CS3 told investigators that prior to

10  meeting with investigators, CS3 sent a text message to SIRMANS to arrange for the deal.

11  During CS3's meeting with law enforcement, investigators observed CS3 sending text

12  messages to SIRMANS attempting to settle on a deal time and location. Ultimately, the

13  deal did not happen that day, and SIRMANS told CS3 that "she" was not responding to

14  SIRMANS's inquiries. Investigators believe that "she" refers to JENSEN and that she

15  was not responding to SIRMANS's requests to obtain heroin from her. Investigators

16  obtained toll records for SIRMANS's phone, which indicated that there were

17  approximately 179 phone contacts between SIRMANS and TT2 on January 9, 2019.

18  Based on this information, investigators believe that JENSEN is SIRMANS's drug

19  supplier.

20      23.     On January 10, 2019, investigators directed CS3 to contact SIRMANS for

21  the purpose of purchasing heroin. Investigators met CS3 at a pre-arranged meeting

22  location where CS3 and CS3's vehicle were searched for contraband, to include drugs,

23  guns, and large amounts of US currency, with negative results. CS3 told investigators

24  that SIRMANS was unable to obtain heroin but had methamphetamine available. CS3

25  arranged to meet SIRMANS at a residence in Bellingham. Investigators provided CS3

26  with pre-recorded buy funds and a concealed recording device. Investigators observed

27  CS3 meeting with SIRMANS in the driveway of the residence. Investigators followed

28

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 8
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   CS3 to a prearranged meeting location where CS3 was searched for contraband, to

2   include additional drugs, firearms and US currency, with negative results.  CS3 provided

3   1.7 grams of methamphetamine to investigators and told them that CS3 met with

4   SIRMANS to purchase the methamphetamine.  This substance field tested positive for

5   the presumptive presence of methamphetamine.  During the controlled purchase,

6   SIRMANS told CS3 that "she" was being inconsistent recently.  Investigators believe

7   that "she" is JENSEN and that SIRMANS was telling CS3 that JENSEN has been

8   inconsistent in responding to SIRMANS's text messages and phone calls, and

9   inconsistent in providing drugs to SIRMANS.

10        24.     CS3 then left the meeting location, and a few minutes after leaving, CS3

11  called investigators.  CS3 told investigators that SIRMANS had just contacted CS3 and

12  told CS3 that SIRMANS had made contact with his female source of supply and that

13  SIRMANS was headed to meet her.  As discussed above, investigators believe that

14  JENSEN is a source of supply for SIRMANS, as such, investigators believe that

15  SIRMANS was referring to JENSEN when SIRMANS stated he was going to meet his

16  source of supply.  According to toll records for SIRMANS's phone, there were 86

17  contacts between SIRMANS and TT2 on January 10, 2019.

18        25.     CS3 has conducted two additional controlled purchases from SIRMANS on

19  January 3, 2019, and January 11, 2018, of 2.1 grams of suspected methamphetamine and

20  4.2 grams of heroin, respectively.  Both substances field tested positive for the

21  presumptive presence of their respective drugs.

22        26.     According to toll records for SIRMANS's phone, there have been

23  approximately 288 telephonic contacts between SIRMANS and TT2 between January 5,

24  2019 and January 10, 2019, and there have been approximately 15 telephonic contacts

25  between SIRMANS and 360-820-8786 (TT3) between December 13, 2018, and

26  December 25, 2018.

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

27.    According to T-Mobile Records, TT3 is subscribed to "Jennifer JENSEN" at 1824 Lakeside Avenue, Bellingham, Washington 98229.

**F.    Arrest of Renton PD CS on January 10, 2019**

28.    On January 10, 2019, a traffic stop was conducted on an individual who subsequently became a Renton Police Department Confidential Source (CS2).  During the traffic stop, CS2 told investigators that CS2 had heroin and methamphetamine in CS2's vehicle and consented to a search of CS2's vehicle. Investigators recovered approximately three ounces of heroin and seventeen ounces of methamphetamine from CS2's vehicle.  CS2 told investigators that CS2 obtained the heroin and methamphetamine from "Stefan Campbell." CS2 was shown a Washington Driver's License for Estaban GARCIA PRONG, who CS2 positively identified as "Stefan Campbell." CS2 agreed to contact GARCIA PRONG and arrange for the controlled purchase of methamphetamine from GARCIA PRONG that evening.  CS2 provided (206) 751-7909 (TT4) as GARCIA PRONG's phone number.

29.    Following the traffic stop, CS2 was activated as a CS in January of 2019. CS2 is cooperating in hopes that law enforcement will not charge CS2 with possession with intent to distribute a controlled substance for the aforementioned traffic stop.  CS2 has had no performance issues to date.  According to NCIC, CS2 has two felony possession of controlled substance violations in 2015 and 2013 respectively. Additionally, CS2 has convictions for Burglary in 2014, Trespassing in 2003, Driving Under the Influence in 2004, Theft in 2013, and minor in possession of alcohol. In addition to CS2's convictions, CS2 has a 2004 arrest for misdemeanor obstructing a law enforcement officer.

30.    According to T-Mobile records, TT4 is T-Mobile cell phone subscribed to "Esteban GARCIA" at 9741 41st Avenue Southwest, Seattle, Washington 98136.

31.    On the same date, CS2 exchanged multiple messages via an encrypted communications system with GARCIA PRONG and arranged to purchase one pound of

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 10
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  methamphetamine at GARCIA PRONG's "studio."  Before the arranged meeting,

2  investigators searched CS2 and CS2's vehicle for money, drugs, and contraband, with

3  negative results.  Investigators gave CS2 pre-recorded buy funds and then followed CS2

4  to a business located at 160 12th Avenue, Seattle, Washington.  CS2 waited for a short

5  time in the parking lot of the business before investigators saw a silver BMW, bearing

6  Washington license plate BML2314, pull into and park in the gravel lot to the north of

7  the business.  A check with the Washington State Department of Licensing shows

8  GARCIA PRONG as the registered owner of the BMW. Investigators observed an

9  unidentified individual retrieve a bag from the trunk of the BMW, and both CS2 and the

10  unidentified individual disappeared out of sight, near a door on the north side of the

11  building.  Investigators were unable to see both individuals enter the door.  Investigators

12  later saw CS2 walk out of the west-facing door of the business and leave the area.

13  Investigators followed CS2 to a pre-arranged meeting location where investigators

14  obtained approximately 16 ounces of methamphetamine from CS2.  CS2 and CS2's

15  vehicle were searched for additional money, drugs, and contraband, with negative results.

16  CS2 told investigators that CS2 obtained the methamphetamine from GARCIA PRONG

17  inside the music studio located in Studio 7 of the business they had entered.  The

18  suspected methamphetamine field tested positive for the presumptive presence of

19  methamphetamine.

20        32.     According to NCIC, GARCIA PRONG had two felony controlled

21  substances violations in 2015, three felony identity theft convictions in 2014, as well as

22  misdemeanor theft and misdemeanor trafficking stolen property convictions in 2010.

23        33.     According to toll records for TT4, TT4 was telephonically in contact with

24  TT2 three times between December 13, 2018, and December 27, 2018.

25  **G.**    **Order to Track TT2, TT3, and TT4 on January 18, 2019**

26        34.     On January 18, 2018, Magistrate Judge Paula L. McCandlis signed an order

27  authorizing the GPS tracking of TT2, TT3, and TT4.

28

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 11
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**H.      DEA Surveillance of JENSEN and CROTEAU on January 28, 2019.**

35.      On January 28, 2019, investigators, using the phone tracker authorized by the court on January 10, 2019, located JENSEN and CROTEAU sitting inside TV1, which was parked in the parking lot of Washington Federal Bank in Bellingham, Washington.  Parked next to TV1 was a Green BMW X5 displaying Washington license plate BNH1647.  A check with the Washington State Department of Licensing showed this vehicle is registered to Trina AUS at 2531 Central Road, Everson, Washington.

36.      While watching the vehicles, investigators saw a white male exit TV1 and return to the driver's seat of the BMW X5.  Law enforcement later saw the driver of the BMW X5, and he appeared similar in appearance to Jeff GEORGE, whom investigators believe, as discussed further below, is AUS's boyfriend.  Both TV1 and the BMW X5 left the bank, one shortly after the other, and both drove towards the interstate, I-5.  Upon reaching I-5, the BMW and TV1 went in different directions; investigators continued to follow both.  Investigators followed TV1 to a nearby storage unit, Pak- A-Nut Storage, and other investigators followed the BMW X5.  Based on training and experience, investigators know that drug traffickers frequently use off site locations, such as storage units or stash houses, to store drugs, money, or other related contraband.  Investigators suspect that JENSEN and CROTEAU could be using the storage unit in their illegal drug activities.  Investigators stopped following TV1 shortly thereafter, but investigators continued following the BMW X5.  Using a pole camera, investigators later saw TV1 parked in the parking lot at 4710 Alderson Road (TL1).  Additionally, TT3 phone tracker data showed TT3 arrive at TL1 at approximately the same time.  Prior to this, TT3 tracker data had consistently been at this address.  According to the Washington department of licensing, CROTEAU's listed address is TL1.

37.      The BMW X5 appeared to drive aimlessly, stopped at multiple locations without anyone leaving the vehicle, and ultimately stopped in the parking lot of Little Cesars Pizza at 2055 Vista Drive, Ferndale, Washington.  Based on training and

1  experience, investigators believe the driver of the BMW X5, was conducting counter

2  surveillance by driving aimlessly and stopping at various locations.  Further, based on

3  training and experience, investigators know that drug traffickers often utilize the methods

4  described herein in an effort to identify and lose law enforcement surveillance.

5         38.    While stopped in the parking lot of Little Cesars Pizza, an unidentified

6  female exited a different BMW that was parked near the BMW X5.  Law enforcement

7  saw the unidentified female get into the passenger seat of the BMW X5.  Investigators

8  continued to follow the BMW X5, but ultimately lost sight of it in traffic; surveillance

9  was then terminated.

10         39.    Based on training and experience, investigators know that drug traffickers

11  often use their vehicles to conceal drugs or money, deliver drugs, and to conduct drug

12  deals to prevent law enforcement from seeing the illegal activity.  Investigators suspect

13  that JENSEN and CROTEAU provided drugs to the driver of the BMW X5.

14  Investigators believe that the driver of the BMW X5 then attempted to lose law

15  enforcement before picking up the unidentified female.

16         40.    Trina AUS, the registered owner of the BMW X5, has multiple felony

17  convictions.  AUS had a felony conviction for possession of a controlled substance

18  without a prescription in 2017 and 2016, a felony conviction for financial fraud in 2017,

19  and a felony conviction for possession of stolen property in 2016.  AUS also had two

20  misdemeanor convictions for theft in 2017.  AUS and GEORGE were arrested together

21  on December 5, 2018, after attempting to elude law enforcement.  She was subsequently

22  charged with attempting to elude and possession of a controlled substance with no

23  prescription.

24         41.    Jeff GEORGE had a felony burglary conviction in 2016.  Additionally,

25  GEORGE had misdemeanor convictions for theft in 2016; solicitation of a controlled

26  substance without a prescription, obstructing law enforcement, and theft in 2015;

27  violation of a no contact order, driving with license suspended or revoked, and disorderly

28

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 13
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  conduct in 2014; driving with license suspended or revoked in 2013; possession of

2  marijuana and drug paraphernalia in 2010; and driving under the influence in 2006.

3       42.     For the December 2018 incident with AUS, GEORGE, who investigators

4  believe to be the boyfriend of AUS based on statements made when they were arrested

5  together, was charged with possession with intent to distribute after he was found to be in

6  possession of U.S. currency and heroin.

7  Toll analysis of TT2 shows that a phone registered to Jeffrey GEORGE, with the same

8  listed address as his Washington Driver's License, was in contact with TT2 on 259

9  occasions between December 27, 2018, and January 8,

10 **I.      Order to Track TV1 on January 31, 2019**

11      43.     On January 31, 2019, Magistrate Judge Paula L. McCandlis signed an order

12 authorizing the GPS tracking of TV1.  Later that same day, using tracker data from TT3,

13 investigators located JENSEN and CROTEAU in TV1 and subsequently installed the

14 GPS tracker on TV1.

15 **J.      Surveillance of JENSEN and CROTEAU on January 31, 2019**

16      44.     On January 31, 2019, investigators used tracker data from TT3 to locate

17 JENSEN and CROTEAU at the AUTOHAUS, 1828 Franklin Street, Bellingham,

18 Washington.  The AUTOHAUS is a used car dealership in Bellingham, Washington.

19 While conducting surveillance, investigators saw JENSEN in TV1 and saw CROTEAU

20 get into **TV2**. Investigators then saw both leave the AUTOHAUS and drive to the Bellis

21 Fair Mall at 1 Bellis Fair Parkway in Bellingham, Washington.  When the vehicles

22 arrived at Bellis Fair Mall, TV1 and **TV2** parked side by side.  Investigators saw items

23 being moved from one vehicle to the other.  Investigators saw JENSEN go in to the Bellis

24 Fair Mall; CROTEAU went in to the mall later.  While both CROTEAU and JENSEN

25 were in the Bellis Fair Mall, investigators installed the GPS tracker on TV1.

26      45.     Later in the evening, CROTEAU returned to TV1 followed by JENSEN.

27 JENSEN got into the driver's seat of TV1, and CROTEAU into the passenger seat.  After

28

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 14
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  a few minutes, investigators saw CROTEAU get out of the front passenger seat and get

2  into the rear passenger seat.  Investigators then saw an individual, later identified as

3  Randall COUSINS, get out of a Corvette, walk to TV1, and get into the front passenger

4  seat.  Investigators then followed TV1 as it drove a loop around the mall and returned to

5  the area where the Corvette was parked.  Investigators saw COUSINS get out of the front

6  passenger seat, return to the driver's seat of the Corvette, and leave the area.  Law

7  enforcement followed the Corvette to a nearby apartment complex, where investigators

8  made contact with and identified COUSINS.  COUSINS got out of the vehicle, and law

9  enforcement observed what they knew, based on training and experience, to be heroin in

10  the front passenger seat of the Corvette.  Law enforcement made contact with the

11  passenger and identified the passenger in the vehicle as Natalya KOLBERT.  Both

12  individuals consented to a search of the vehicle.  Law enforcement found what they

13  suspected to be, based on training and experience, heroin and methamphetamine between

14  the driver's seat and center console of the Corvette.  The substances later field tested

15  presumptive positive for the respective presence of heroin and methamphetamine.  Law

16  enforcement recovered approximately 9.8 gross grams of heroin and 7.8 gross grams of

17  methamphetamine from that area of the vehicle.  Natalya KOLBERT was found to be in

18  possession of two baggies of suspected heroin, one weighed approximately 2 gross grams

19  and the other approximately 3.6 gross grams.  Both baggies of suspected heroin field

20  tested presumptive positive for heroin.  Both COUSINS and KOLBERT told

21  investigators they had purchased their drugs from JENSEN at the Bellis Fair Mall.

22  **K.**    **Analysis of Tracker Data and Surveillance of JENSEN and CROTEAU on**

23           **February 1, 2019**

24           46.    On February 1, 2019, investigators reviewed tracker data for TT2, TT3, and

25  TT4.  Tracker data showed that TT3, a phone used by CROTEAU, and TT4, a phone

26  used by GARCIA PRONG, were in close proximity to one another from approximately 2

27  a.m., to until approximately 8:30 a.m., at the Tulalip Casino Resort in Tulalip,

28  Washington.  Investigators went to Tulalip Casino and spoke with hotel management and

1   were told that JENSEN had rented a room, room 1111 (**TL5**), at the hotel.  Investigators

2   then contacted the security at the Resort and reviewed video from earlier in the morning.

3   Looking at security video, investigators observed JENSEN and CROTEAU leave **TL5**,

4   walk to meet GARCIA PRONG just outside the entrance to the hotel, and then all three

5   return to **TL5**; investigators saw GARCIA PRONG carrying a backpack when he went

6   into **TL5** with JENSEN and CROTEAU.  The security footage showed that a short time

7   later, all three left **TL 5** and went to the hotel lobby together, and that GARCIA PRONG

8   was still carrying the backpack.  Tracker data for **TT4** showed GARCIA PRONG left the

9   area at approximately 8:30 a.m., and returned to the north Seattle area.  Investigators

10  believe that GARCIA PRONG met JENSEN and CROTEAU at the Tulalip Casino, went

11  into **TL5**, and provided drugs to JENSEN and CROTEAU for them to resell.

12          47.     While some investigators were reviewing security camera footage, other

13  investigators found **TV2** parked in the parking garage behind the Seattle Premium

14  Outlets, 10600 Quil Ceda Boulevard, Tulalip, Washington; Seattle Premium Outlets are

15  next door to the Tulalip Casino and Resort.  Investigators later observed CROTEAU and

16  JENSEN return to **TV2** and drive to the hotel parking lot.  Investigators that were with

17  casino security reviewing the security video, saw JENSEN and CROTEAU walk through

18  the hotel with CROTEAU dragging a small luggage bag and JENSEN carrying bags from

19  the Seattle Premium Outlets.  Investigators watched the video until JENSEN and

20  CROTEAU returned to **TL5**.

21          48.     Based on the information outlined herein, as well as their training and

22  experience, investigators believe that GARCIA PRONG met with CROTEAU and

23  JENSEN at the Tulalip Casino and Resort and provided them with drugs that GARCIA

24  PRONG carried in his backpack.  Investigators believe CROTEAU and JENSEN are

25  currently storing those drugs in **TL5** and **TV2**.

26          49.     During the preparation of this affidavit, investigators have been conducting

27  surveillance at Tulalip Casino and Resort to ensure that CROTEAU and JENSEN are still

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the occupants of **TL5**. Investigators are monitoring the location of **TV2** and are in contact

2  with hotel personnel about any changes to the occupancy of **TL5**.

3  **L.      Knowledge Based on Training and Experience**

4        50.      Based on my training and experience, and my discussions with other

5  experienced officers and agents involved in drug investigations, I know the following:

6                a.      Traffickers of controlled substances, and those who assist them,

7  maintain and tend to retain accounts or records of their drug trafficking activities,

8  including lists of drug quantities and money owed, telephone records including contact

9  names and numbers, photographs, and similar records of evidentiary value.  These items

10  are generally kept in locations where drug traffickers believe their property is secure and

11  will remain undetected from law enforcement, such as inside their homes, vehicles, hotel

12  rooms, and storage lockers.

13                b.      Traffickers of controlled substances commonly maintain addresses,

14  vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or

15  telephone numbers of their suppliers, customers and associates in the trafficking

16  organization and it is common to find drug traffickers keeping records of said associates

17  in cellular telephones and other electronic devices.  Traffickers almost always maintain

18  cellular telephones for ready access to their clientele and to maintain their ongoing

19  narcotics business.

20                c.      Traffickers maintain evidence of their criminal activity at locations

21  that are convenient to them, including their residences vehicles, hotel rooms, and storage

22  lockers.  This evidence often includes more than contraband and paraphernalia and

23  includes financial records, records of property and vehicle ownership, records of property

24  rented, records of post office boxes used to ship and receive contraband and currency,

25  records of other storage facilities used to hide drugs or currency, and other documentary

26  evidence relating to commission of, and proceeds from, their crimes.

27

28

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 17
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          d.      During the execution of search warrants, it is common to find

2  papers, letters, billings, documents, and other writings that show ownership, dominion,

3  and control of vehicles, residences, and/or storage units.

4          e.      Persons trafficking and using controlled substances commonly sell

5  or use more than one type of controlled substance at any one time.

6          f.      Drug traffickers frequently maintain items necessary for weighing,

7  packaging, and cutting drugs for distribution.  This paraphernalia often includes, but is

8  not limited to, scales, plastic bags, pill presses and cutting/diluting agents and items to

9  mask the odor of drugs

10         g.      Drug traffickers often maintain weapons, including guns and

11  ammunition, in secure locations such as their residences and storage lockers, in order to

12  protect their drugs and drug proceeds.

13         h.      Drug traffickers often have false identification documents and

14  identification documents in the names of others.

15         i.      Drug trafficking is usually a cash business, and in order to escape

16  notice from authorities for using unexplained income, or hide excessive cash from illegal

17  activities, traffickers either keep large quantities of cash at home or other secure locations

18  such as a vehicles, hotel rooms, and storage locker, or convert the cash into other

19  valuable assets, such as jewelry, precious metals, monetary instruments, or other

20  negotiable forms of wealth.  Records of such conversions are often stored where a

21  trafficker lives or stays over night.

22         51.     Drug dealers often use cellular telephones as a tool or instrumentality in

23  committing their criminal activity. They use them to maintain contact with their suppliers,

24  distributors, and customers. They prefer cellular telephones because, first, they can be

25  purchased without the location and personal information that land lines require. Second,

26  they can be easily carried to permit the user maximum flexibility in meeting associates,

27  avoiding police surveillance, and traveling to obtain or distribute drugs. Third, they can be

28

1   passed between members of a drug conspiracy to allow substitution when one member

2   leaves the area temporarily. I also know that it is common for drug traffickers to retain in

3   their possession phones that they previously used, but have discontinued actively using, for

4   their drug trafficking business. Based on my training and experience, the data maintained

5   in a cellular telephone used by a drug dealer is evidence of a crime or crimes. This includes

6   the following:

7           a.      The assigned number to the cellular telephone (known as the mobile

8         directory number or MDN), and the identifying telephone serial number (Electronic

9         Serial Number, or ESN), (Mobile Identification Number, or MIN), (International

10        Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity,

11        or IMEI) are important evidence because they reveal the service provider, allow us

12        to obtain subscriber information, and uniquely identify the telephone. This

13        information can be used to obtain toll records, to identify contacts by this telephone

14        with other cellular telephones used by co-conspirators, to identify other telephones

15        used by the same subscriber or purchased as part of a package, and to confirm if the

16        telephone was contacted by a cooperating source or was intercepted on a wiretap

17        here or in another district.

18          b.      The stored list of recent received calls and sent calls is important

19        evidence. It identifies telephones recently in contact with the telephone user. This is

20        valuable information in a drug investigation because it will identify telephones used

21        by other members of the organization, such as suppliers, distributors, and customers,

22        and it confirms the date and time of contacts. If the user is under surveillance, it

23        identifies what number he called during or around the time of a drug transaction or

24        surveilled meeting. Even if a contact involves a telephone user not part of the

25        conspiracy, the information is helpful (and thus is evidence) because it leads to

26        friends and associates of the user who can identify the user, help locate the user, and

27

28

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 19
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

provide information about the user. Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

    c.    Stored text messages are important evidence, similar to stored numbers. Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

    d.    Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. Pictures also identify associates likely to be members of the drug trafficking organization. Some drug dealers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs.

    e.    Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

## VII.   CONCLUSION

52.    Based on the information set forth herein, there is probable cause to search the above described Target Location and Target Vehicle, as further described in Attachment A , for evidence, fruits and instrumentalities, as further described in Attachment B, of crimes committed by the individuals listed in this affidavit and their coconspirators, specifically distribution of, and possession with intent to distribute, controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; use of communications facilities to commit, facilitate, or further an act or acts which constitute a felony in violation of Title 21, United States Code, Section 843(b); and/or money laundering and conspiracy to launder money, in violation of Title 18, United States Code 1956 and 1956(h).

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 20
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## VIII.  REQUEST FOR SEALING

53.      Based upon my knowledge, training, and experience, it is my belief that the information contained in this affidavit, if prematurely disclosed to the public, could cause the targets to flee, destroy or tamper with evidence, intimidate or retaliate against potential witnesses, and could otherwise seriously jeopardize the ongoing investigation.

54.      Therefore, to avoid seriously endangering the DEA investigation, and to avoid the risk of the suspects' flight from prosecution and destruction of evidence prior to indictment, I request that this pleading be sealed and that notice required by Fed. R. Crim. P. 41(f) be delayed for up to 90 days after expiration of the tracker warrant, or any extension thereof, in accordance with Title 18, United States Code, Section 3103a(b).  If necessary, I may request that the Court, upon a showing of good cause, order a further adjournment of the time permitted to serve notice, if necessary to protect the safety of any individual, avoid flight or destruction of evidence, and ensure that the investigation is not jeopardized prior to its completion.

Anthony L. Paz
**Task Force Officer**
**Drug Enforcement Administration**

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the 1st day of February, 2019.

**Hon. David W. Christel**
**United States Magistrate Judge**

AFFIDAVIT OF TASK FORCE OFFICER PAZ - 21
USAO #2018R01373

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Attachment A

Property and Vehicle to Be Searched

- **Target Location 5 (TL5):  Tulalip Resort Casino, Room 1111, located at 10200 Quil Ceda Blvd, Marysville, Washington**. This property is a hotel room located inside the Tulalip Resort Casino. The hotel room is marked with the hotel room number 1111. TL5 is believed to be the hotel room of Jennifer JENSEN and Charles CROTEAU.

- **Target Vehicle 2 (TV2):** is a Gray, 2007 BMW X5 displaying Washington License plate BNH2302. TV2 is registered to Charles CROUTEAU.

**Attachment B**

List of Items to be Searched for and Seized

This warrant authorizes the government to search for and seize the following items:

Evidence and/or fruits of the commission of the following crimes:  Distribution of, and possession with intent to distribute, controlled substances, and conspiracy to commit this offense, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1), and 846; Money laundering and conspiracy to launder money, in violation of Title 18, United States Code, Sections 1956 and 1956(h); Use of communication facilities to commit, facilitate, or further an act or acts which constitute a felony in violation of Title 21, United States Code, Section 843(b);

1.      **Controlled Substances**:  Including but not limited to heroin, fentanyl, methamphetamine, cocaine, and Vicodin/oxycodone.

2.      **Drug Paraphernalia**:  Items used, or to be used, to store, process, package, use, and/or distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, tape, hockey or duffel bags, chemicals or items used to test the purity and/or quality of controlled substances, and similar items.

3.      **Drug Transaction Records**:  Documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances, including such records stored in electronic format.

4.      **Customer and Supplier Information**:  Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items, including such records stored in electronic format.

5.      **Cash and Financial Records**:  Currency and financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; other records that show income and expenditures, net worth, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, and similar items, including such records stored in electronic format; and money counters.

6.      **Photographs/Surveillance**:  Photographs, video tapes, digital cameras, surveillance cameras, and associated hardware/storage devices, and similar items, depicting property occupants, friends and relatives of the property occupants, or suspected buyers or sellers of controlled substances, controlled substances or other

**Attachment B**

List of Items to be Searched for and Seized

contraband, weapons, and assets derived from the distribution of controlled substances, including such records stored in electronic format.

7.  **Weapons**:  Firearms, magazines, ammunition, and body armor, and other weapons-related items such as holsters and equipment to clean firearms.

8.  **Codes**:  Evidence of codes used in the distribution of controlled substances, including but not limited to passwords, code books, cypher or decryption keys, and similar information.

9.  **Property Records**:  Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the purchase, ownership, rental, income, expenses, or control of the premises, and similar records of other property owned or rented.

10.  **Indicia of occupancy**, residency, and/or ownership of assets including, but not limited to, utility and telephone bills, canceled envelopes, rental records or payment receipts, leases, mortgage statements, and other documents.

11.  **Evidence of Storage Unit Rental or Access**:  rental and payment records, keys and codes, pamphlets, contracts, contact information, directions, passwords, or other documents relating to storage units.

12.  **Evidence of Personal Property Ownership**:  Registration information, ownership documents, or other evidence of ownership of personal property including, but not limited to, vehicles, vessels, boats, airplanes, jet skis, all-terrain vehicles, RVs, and other personal property; evidence of international or domestic travel, hotel/motel stays; and any other evidence of unexplained wealth.

13.  **Individual and business financial books**, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, such as:

    a.  Employment records:  paychecks or stubs, lists and accounts of employee payrolls, records of employment tax withholdings and contributions, dividends, stock certificates, and compensation to officers.

    b.  Savings accounts:  statements, ledger cards, deposit tickets, register records, wire transfer records, correspondence, and withdrawal slips.

    c.  Checking accounts:  statements, canceled checks, deposit tickets, credit/debit documents, wire transfer documents, correspondence, and register records.

**Attachment B**

List of Items to be Searched for and Seized

      d.     Loan Accounts:  financial statements and loan applications for all loans applied for, notes, loan repayment records, and mortgage loan records.

      e.     Collection accounts:  statements and other records.

      f.     Certificates of deposit:  applications, purchase documents, and statements of accounts.

      g.     Credit card accounts:  credit cards, monthly statements, and receipts of use.

      h.     Receipts and records related to gambling wins and losses, or any other contest winnings.

      i.     Insurance:  policies, statements, bills, and claim-related documents.

      j.     Financial records:  profit and loss statements, financial statements, receipts, balance sheets, accounting work papers, any receipts showing purchases made, both business and personal, receipts showing charitable contributions, and income and expense ledgers.

14.     All bearer bonds, letters of credit, money drafts, money orders, cashier's checks, travelers checks, Treasury checks, bank checks, passbooks, bank drafts, money wrappers, stored value cards, and other forms of financial remuneration evidencing the obtaining, secreting, transfer, and/or concealment of assets and/or expenditures of money.

15.     All Western Union and/or Money Gram documents and other documents evidencing domestic or international wire transfers, money orders, official checks, cashier's checks, or other negotiable interests that can be purchased with cash. These documents are to include applications, payment records, money orders, frequent customer cards, etc.

16.     Negotiable instruments, jewelry, precious metals, financial instruments, and other negotiable instruments.

17.     Documents reflecting the source, receipt, transfer, control, ownership, and disposition of United States and/or foreign currency.

18.     Correspondence, papers, records, and any other items showing employment or lack of employment.

19.     Telephone books, and/or address books, facsimile machines to include the other memory system, any papers reflecting names, addresses, telephone numbers, pager numbers, cellular telephone numbers, facsimile, and/or telex numbers, telephone records and bills relating to co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists. Also, telephone answering devices that record telephone conversations and the tapes therein for

**Attachment B**

List of Items to be Searched for and Seized

messages left for or by co-conspirators for the delivery or purchase of controlled substances or laundering of drug proceeds.

20.     Safes and locked storage containers, and the contents thereof that are otherwise described in this document.

21.     Tools:  Tools that may be used to open hidden compartments in vehicles, paint, bonding agents, magnets, or other items that may be used to open/close or conceal said compartments.

22.     Cell Phones: Cellular telephones and other communications devices including smartphones (i.e., iPhones, Android phones, Blackberries, and the like) may be seized.